Sander v Westchester Reform Temple (2025 NY Slip Op 06958)

Sander v Westchester Reform Temple

2025 NY Slip Op 06958

Decided on December 16, 2025

Court of Appeals

Halligan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on December 16, 2025

No. 100 

[*1]Jessie Sander, Appellant,
v
Westchester Reform Temple, et al., Respondents.

Robert L. Herbst, for appellant.
Michael J. Reed, for respondents.

HALLIGAN, J.

Plaintiff Jessie Sander alleges that she was fired from her teaching position at Westchester Reform Temple for co-authoring a blog post critical of Israel and Zionism, in violation of Labor Law § 201-d (2) (c). That provision prohibits an employer from taking adverse action against an employee based on legal "recreational activities."
We have not had occasion to consider the scope of section 201-d or whether its protection of "recreational activities" encompasses the public expression of one's views. The Legislature appears not to have considered this problem when it enacted the statute in 1992, well before the proliferation of various mechanisms for disseminating information online. We reserve this question of statutory interpretation for another day, though. Whatever the scope of section 201-d, Plaintiff's claim is barred by the ministerial exception, which precludes application of employment discrimination laws to claims involving an employment relationship between a religious institution and its ministers. Plaintiff's offer letter conclusively establishes that her core teaching responsibilities were religious, rather than secular, in nature. Accordingly, we affirm on this alternative ground.
I
In May 2021, Plaintiff received an offer for the position of "Full Time Jewish Educator" at Westchester Reform Temple (the Temple). The offer letter stated that her responsibilities would include teaching in "Jewish Learning Lab classrooms for 15 hours a week," as well as "family and parent education, social justice programming, field trips and other off-site programs, communications, administrative support, and writing articles for Synagogue publications." The letter also described aspects of the Temple's "mission," including "support[ing] the development of a strong Jewish identity" and "bringing Torah to life and inspiring Jewish dreams."
Soon after Plaintiff began work, a Rabbi at the Temple met with her about a blog post she had recently co-written. The blog post said, among other things, that the authors felt compelled to "speak out against israel's [sic] most recent attack on Gaza" and "reject[ed] the notion that Zionism is a value of Judaism." Plaintiff alleges that she and the Rabbi discussed the meaning of Zionism, and she assured him that she respected the Temple's position and would not share her views on the job. Plaintiff also alleges that the Rabbi subsequently expressed complete confidence in her teaching abilities. Nonetheless, Plaintiff was fired less than a week later.
Plaintiff sued the Temple and its leadership, alleging that she had been fired for legal recreational activity in violation of Labor Law § 201-d (2) (c). Defendants moved to dismiss, arguing that the complaint failed to state a cause of action (see CPLR 3211 [a] [7]) because Plaintiff did not engage in a "recreational activity" for purposes of section 201-d and her actions created a material conflict with the Temple's interests under section 201-d (3) (a), and further that Plaintiff's claim was barred by the ministerial exception and thus should be dismissed based on documentary evidence (see id. § 3211 [a] [1]).
Supreme Court granted the motion to dismiss, holding that the complaint failed to state a cause of action because it alleged that Plaintiff was terminated for the content of her blog posting, not the act of blogging (2022 NY Slip Op 34794[U] [Sup Ct, Westchester County 2022]). The court did not decide whether blogging is a recreational activity protected by section 201-d or address the alternative grounds for dismissal.
The Appellate Division affirmed on the same grounds, and likewise declined to address the material conflict or ministerial exception defenses (see 228 AD3d 688 [2d Dept 2024]). We granted leave to appeal (42 NY3d 910).
II
The parties dispute whether Plaintiff's blogging and, separately, the content of her blog post is protected recreational activity under Labor Law § 201-d. That section, enacted in 1992, makes it unlawful for "any employer or employment agency" to refuse to hire, discharge, or discriminate against an individual "because of" certain protected activities: "political activities outside of working hours," "legal use of consumable products," "legal recreational activities," and "membership in a union or any exercise of [union] rights" (Labor Law § 201-d [2] [a]-[d]). As relevant here, the statute "shall not be deemed to protect activity which creates a material conflict of interest related to the employer's trade secrets, proprietary information or other proprietary or business interest" (id. § 201-d [3] [a]).[FN1]
Plaintiff relies on the protection for "legal recreational activities, including cannabis in accordance with state law, outside work hours, off the employer's premises and without use of the employer's equipment or other property" (id. § 201-d [2] [c]). Section 201-d (1) (b), in turn, defines "recreational activities." It sweeps broadly on its face, protecting "any lawful, leisure-time activity for which the employee receives no compensation and which is generally engaged in for recreational purposes, including but not limited to sports, games, hobbies, exercise, reading and the viewing of television, movies, and similar material" (id. § 201-d [1] [b]). The term "hobbies" has an expansive dictionary definition (see Merriam-Webster.com Dictionary, hobby [https://www.merriam-webster.com/dictionary/hobby] ["a pursuit outside one's regular occupation engaged in especially for relaxation"]). Plaintiff argues that some hobbies surely have an expressive component and communicate content, and that reading or viewing media entails the selection of content as well.
Two versions of section 201-d passed the Legislature and were vetoed by the Governor before the final version was enacted in 1992. The first iteration broadly protected "legal activities" with no exceptions or [*2]enforcement provisions, and the Governor vetoed it because it was "so broadly drawn that it ha[d] certain potential applications which [were] probably unintended" (Governor's Veto Mem, Veto Jacket, Veto 15 of 1990 at 8). An amended version, which included exceptions and an enforcement mechanism, was also vetoed because it still did not define "legal activities" (Governor's Veto Mem, Veto Jacket, Veto 420 of 1991 at 14).
The 1992 bill was intended to address "instances in which employers are trying to regulate an employee's off-duty activities, contending that what employees do off-hours has an impact on the employer" and to "ensure that employers do not tell us how to think and play on our own time" (Senate Introducer's Memorandum, Bill Jacket, L 1992, ch 776 at 9). But the 1992 bill also had "a much narrower focus" than the vetoed bills by limiting protection "to four areas: legal use of consumable products, legal recreational activities, political activities . . . , and labor union activities," rather than "legal activities" generally (Assembly Labor Chair Frank J. Barbaro's Mem in Support, Bill Jacket, L 1992, ch 776 at 16). The legislative history sheds little guidance on what qualifies as a recreational activity, and reveals no consideration of whether, or to what extent, the statute protects expression generated in the course of what is determined to be a protected recreational activity.
We need not resolve today questions such as whether the statute covers blogging specifically or public expression generated during any protected activity, because the ministerial exception dispositively bars Plaintiff's claim. That exception "precludes application of [employment discrimination] legislation to claims concerning the employment relationship between a religious institution and its ministers" (Hosanna—Tabor Evangelical Lutheran Church and School v EEOC, 565 US 171, 188 [2012]). Requiring a religious institution "to accept or retain an unwanted minister, or punishing [them] for failing to do so" both "infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments" and "violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions" (id. at 188-189).
The Supreme Court has instructed that there is no "rigid formula for deciding when an employee qualifies as a minister" (Hosanna-Tabor, 565 US at 190). In concluding that a Lutheran elementary school teacher was covered by the exception, the Supreme Court considered the teacher's "formal title," "the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church" (id. at 192). More recently, the Court held that two Catholic elementary school teachers were ministers even though they lacked ministerial titles and formal religious training (see Our Lady of Guadalupe School v Morrissey-Berru, 591 US 732, 757 [2020]). The Court emphasized "their core responsibilities as teachers of religion," noting that they "prayed with their students, attended Mass with the students, and prepared the children for their participation in other religious activities" (id.).
Defendants invoked the ministerial exception here as grounds for dismissal on a CPLR 3211 (a) (1) motion. Such a motion "may be appropriately granted only where the documentary evidence utterly refutes plaintiff's factual allegations, conclusively establishing a defense as a matter of law" (Goshen v Mutual Life Ins. Co. of N.Y., 98 NY2d 314, 326 [2002]). Defendants rely on Plaintiff's offer letter, which is appended as an exhibit to the motion to dismiss. It states that Plaintiff was responsible for guiding the development of programs such as "Shabbat, Havdalah, and other teen led events and initiatives"; planning, supporting, and attending "Confirmation" experiences; and supporting the "Rabbi's Table initiative." In her fifteen weekly hours of teaching, she was responsible for "Chevruta (1:1 tutoring for our learners)," "Pre-bimah tutoring," and "Parsha of the week." And she was responsible for furthering the Temple's "mission," including by "support[ing] the development of a strong Jewish identity" and "bringing Torah to life and inspiring Jewish dreams."
These descriptions establish that Plaintiff's "core responsibilities as [a] teacher[ ] of religion" are similar to those in Hosanna-Tabor and Our Lady of Guadalupe (591 US at 757). She was responsible for teaching religious texts through one-on-one study and weekly Torah portions, as well as planning and attending religious programming. Those duties leave little doubt that she was charged with "educating young people in their faith" (id. at 753). Although Plaintiff counters that her responsibilities were "secular rather than religious," that allegation is conclusory, limited to a single paragraph in her complaint, and plainly untenable from the face of the offer letter.
We acknowledge that the ministerial exception presents a fact-intensive question that is generally not amenable to resolution on a motion to dismiss. But Plaintiff worked in her position for less than three weeks, and discovery is therefore unlikely to yield additional facts about her job responsibilities. In these circumstances, the offer letter alone conclusively establishes that the ministerial exception applies.
Accordingly, the order of the Appellate Division should be affirmed, with costs.

RIVERA, J. (concurring):

Blogging—writing about one's observations, experiences, or areas of interest on an online platform—can be a recreational activity depending on the blogger's intended purpose. Assuming, without deciding, that plaintiff's blogging about her views on Israel and Zionism is a recreational activity under Labor Law § 201-d, I conclude that her blog post created a material conflict of interest with defendant's business interest and is thus unprotected by the statute (see Labor Law § 201-d [3] [a]). Therefore, plaintiff's complaint was properly dismissed for failure to state a cause of action, and I agree with the majority, on different grounds, that the order of the Appellate Division should be affirmed.
I.
Labor Law § 201-d (2) (c) prohibits employers from taking adverse employment action "against an individual . . . because of . . . [their] legal recreational activities." Labor Law § 201-d (1) (b) defines "recreational activities" as "any lawful, leisure-time activity, for which the employee receives no compensation and which is generally engaged in for recreational purposes, including but not limited to sports, games, hobbies, exercise, reading and the viewing of television, movies and similar material." To make out a claim under § 201-d (2) (c), a plaintiff must establish that they were engaged in a "legal recreational activit[y], . . . outside work hours, off of the employer's premises and without use of the employer's equipment or other property." However, even if the plaintiff establishes that their activity constituted a "recreational activit[y]" under the statutory definition (see Labor Law § 201-d [1] [b]), such activity "shall not be deemed . . . protect[ed]" if it "creates a material conflict of interest related to the employer's trade secrets, proprietary information or other proprietary or business interest" (see Labor Law § 201-d [3] [a]).
Plaintiff Jessie Sander claims she was terminated from her employment with defendant Westchester Reform Temple (the Temple) in violation of Labor Law § 201-d (2) (c) because of her "recreational blog post" criticizing Israel's May 2021 attack on Gaza. The Temple and the individual defendants moved to dismiss the complaint pursuant to CPLR 3211 (a) (7) for failure to state a claim and (a) (1) based on documentary evidence.
Labor Law § 201-d (1) (b)'s non-exhaustive list of example activities does not expressly identify the act of blogging as a "recreational activity." Two principles of construction guide the analysis here. First, ejusdem generis, meaning "of the same kind," is a rule "by which a series of specific words describing things or concepts of a particular sort are used to explain the meaning of a general one in the same series" (Matter of Riefberg, 58 NY2d 134, 141 [1983]; see also McKinney's Cons Laws of NY, Book 1, Statutes § 239 [b] [explaining that the rule limits the scope of a word based on its surrounding terms]). Under the rule, general words in a statute "are to be restricted to persons or things of like kind with those particularly mentioned, unless plainly otherwise intended" (St. Luke's Hosp. v Godet, 171 Misc 7, 11 [NY City Ct 1939]). Second, "[i]n the absence of any controlling statutory definition," this Court has "construe[d] words of ordinary import with their usual and commonly understood meaning, and in that connection ha[s] regarded dictionary definitions as 'useful guideposts' in determining the meaning of a word or phrase (Rosner v Metro. Prop. & Liab. Ins. Co., 96 NY2d 475, 479-480 [2001], quoting Matter of Vil. of Chestnut Ridge v Howard, 92 NY2d 718, 723 [1999]).
The word "blog"—derived from weblog—is a noun, defined variously as "a website that contains online personal reflections, comments, and often hyperlinks, videos, and photographs provided by the writer" (Merriam-Webster.com Dictionary, blog [https://www.merriam-webster.com/dictionary/blog]), and "[a] frequently updated [*3]website, typically run by a single person and consisting of personal observations arranged in chronological order, excerpts from other sources, hyperlinks to other sites, etc." and "an online journal or diary" (Oxford English Dictionary, blog [https://www.oed.com/dictionary/blog_n]). To "blog" (or "blogging") is a verb that describes the act of "writ[ing] or hav[ing] a blog" (Merriam-Webster.com Dictionary, blog [https://www.merriam-webster.com/dictionary/blog]). Thus, depending on the blog's content, uncompensated blogging may be a recreational activity, such as blogging about a recent vacation or the best local vegan eateries. These examples describe leisure-time musings—akin to "hobbies," a protected recreational activity under Labor Law § 201-d (1) (b). As the majority notes, "[t]he term 'hobbies' has an expansive dictionary definition" (majority op at 5 [citation omitted]). Further, plaintiff rightly argues that some hobbies surely have an expressive component and communicate content (majority op at 5). Thus, there is support for interpreting blogging as a hobby or as a sufficiently similar activity to be of "like kind" (St. Luke's Hosp., 171 Misc at 11). By contrast, other types of blog content may intend to provoke strong emotional responses in a manner disassociated from any leisurely endeavor of the writer. For example, blogging the writer's viewpoint to encourage others to take political action may not have a recreational purpose or be relaxing, fun, or entertaining; rather, it may be a convenient method for the writer to disseminate a message motivated by a sense of societal duty and responsibility.
Plaintiff's blogging is no doubt her physical act of posting her thoughts on a certain topic on her website. However, whether plaintiff's blogging can be characterized as a recreational activity based on its content is not as clear. I agree with the majority that we need not answer that question on this appeal because, assuming plaintiff's blogging is a recreational activity under Labor Law § 201-d, it falls outside the statute's protection. In my view, plaintiff's blogging about her views on Israel "create[d] a material conflict of interest related to [her] employer's . . . business interest" (Labor Law § 201-d [3] [a]), making it unnecessary to consider defendants' ministerial exception defense.
II.
Courts "are bound by principles of judicial restraint not to decide constitutional questions 'unless their disposition is necessary to the appeal' " (Matter of Clara C. v William L., 96 NY2d 244, 250 [2001], quoting People v Carcel, 3 NY2d 327, 330 [1957]). Therefore, it is well-settled that we should dispose of cases on nonconstitutional grounds where possible (Peters v New York City Hous. Auth., 307 NY 519, 527-528 [1954]). Here, because "a construction of the statute is fairly possible by which the [constitutional] question may be avoided," I would resolve this appeal based on principles of statutory interpretation, rather than, as the majority does, on the application of the constitutional ministerial exception (id. at 528).
This course is especially prudent given the continued doctrinal evolution of the ministerial exception. In particular, the United States Supreme Court has declined to adopt a "rigid formula" to determine which employees fall within the ministerial exception (see Hosanna-Tabor Evangelica Lutheran Church & Sch. v Equal Empl. Opportunity Commn., 564 US 171, 190 [2012]; Our Lady of Guadalupe Sch. v Morrissey-Berru, 591 US 732, 736 [2020]). The flexibility of the Court's legal standard and its expansion of the ministerial exception have led to mixed and, at times, confusing outcomes in the federal Circuit Courts of Appeals (see e.g. McMahon v World Vision Inc., 147 F4th 959, 966 [9th Cir 2025] [extending ministerial exception beyond traditional domain of clergy and teachers to cover customer service representatives who perform "key religious functions central to (the organization's) mission"]; Billard v Charlotte Catholic High Sch., 101 F4th 316, 333 [4th Cir 2024] [holding that a high school English and drama teacher, who substituted as a religion teacher approximately three times, qualified as a minister for purposes of the exception]; Palmer v Liberty Univ., Inc., 72 F4th 52, 69 [4th Cir 2023], cert denied sub nom. Liberty Univ., Inc. v Bowes, 144 S Ct 1030 [2024], and cert denied sub nom. Bowes v Liberty Univ., Inc., 144 S Ct 1030 [2024] [declining to resolve ministerial exception question based on constitutional-avoidance grounds, while featuring two concurrences asserting diametrically opposed understandings of the ministerial exception];[FN1] see also DeWeese-Boyd v Gordon Coll., 487 Mass 31, 32-33, 53-54 [2021], cert denied 142 S Ct 952 [2022] [noting "the [*4]parameters of the (ministerial) exception . . . remain somewhat unclear" and holding ministerial exception did not apply to associate professor of social work who integrated Christian faith into her academic teaching, as doing so would represent a "significant expansion of the ministerial exception doctrine"]).
Moreover, as the majority acknowledges, whether the ministerial exception applies is generally a fact-intensive determination, not readily capable of resolution on a motion to dismiss (majority op at 8; see also Guadalupe, 591 US at 758 ["call(ing) on courts to take all relevant circumstances into account and to determine whether each particular position implicated the fundamental purpose of the exception"]; Fratello v Archdiocese of New York, 863 F3d 190, 206-210 [2d Cir 2017] [engaging in a fact-intensive, circumstance-specific analysis under Hosanna-Tabor]). Indeed, Hosana-Tabor and Guadalupe, relied upon by the majority, were decided upon summary judgment and not at the pleading stage (majority op at 7-8; Hosanna-Tabor, 564 US at 180-181; Guadalupe, 591 US at 742-743). Here, plaintiff alleges that her job was, in fact, secular in nature. The Temple claims otherwise. The offer letter plaintiff received cannot decisively resolve this factual dispute between the parties. The letter does not "utterly refute[ ] plaintiff's factual allegations" that her job was other than what the letter describes, and thus it cannot "conclusively establish[ ]" the ministerial exception defense as a matter of law (Goshen v Mut. Life Ins. Co. of New York, 98 NY2d 314, 326 [2002]; see Audthan LLC v Nick & Duke, LLC, 42 NY3d 292, 303 [2024] ["To succeed under (CPLR 3211 [a] [1]), (the movant's) documentary evidence must utterly refute (the nonmovant's) factual allegations, conclusively establishing a defense as a matter of law" (internal quotation marks omitted)]). Further discovery would be necessary to determine plaintiff's actual responsibilities during her employment. Therefore, the majority's dismissal on CPLR 3211 (a) (1) grounds based on this documentary evidence finds no support in the minimal record before us (see majority op at 7-8).
Given our doctrine of constitutional avoidance, ongoing federal legal developments relating to the contours of the ministerial exception, and the lack of a sufficient factual record regarding plaintiff's assigned duties given the preliminary stage of the litigation, it is quite clear that we should simply decide this case under the Labor Law and apply the statutory conflict of interest exception. As I discuss, that exception plainly applies here and supports dismissal of the complaint pursuant to CPLR 3211 (a) (7) for failure to state a claim.
III.
When reviewing a motion to dismiss under CPLR 3211 (a) (7) for failure to state a claim, "a court must give the complaint a liberal construction, accept the allegations as true, and provid[e] plaintiffs with the benefit of every favorable inference . . . ." (see Moore Charitable Found. v PJT Partners, Inc., 40 NY3d 150, 153 [2023]; Cortlandt St. Recovery Corp. v Bonderman, 31 NY3d 30, 38 [2018]; AG Capital Funding Partners, L.P. v State St. Bank & Trust Co., 5 NY3d 582, 591 [2005]). "Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11, 19 [2005]). Moreover, "[u]nlike on a motion for summary judgment where the court searches the record and assesses the sufficiency of the parties' evidence, on a motion to dismiss the court merely examines the adequacy of the pleadings" (Davis v Boeheim, 24 NY3d 262, 268 [2014] [internal quotation marks omitted]).
As a general matter, conflicts of interest in the employment setting confer some benefit on the employee or a competitor at the expense of the employer's business interests (see e.g. Phansalkar v Andersen Weinroth & Co., L.P., 344 F3d 184, 203 [2d Cir 2003] [applying New York law, while explaining that "(a)bsent an agreement otherwise, an employee who makes a profit or receives a benefit in connection with transactions conducted by (them) on behalf of (their) employer is under a duty to give such profit or benefit to (their) employer, whether or not it was received by the employee in violation of (their) duty of loyalty"]). However, as discussed below, the relevant legislative history and caselaw encourage a broad reading of the statutory exception where a "material conflict of interest" may exist even when an employee is not engaged in economically self-serving conduct (see Labor Law § 201-d [3] [a]).
As the majority notes (majority op at 5), prior to the enactment of the statute, the Governor vetoed two earlier versions of the bill for failing to adequately protect an employer's ability to regulate off-duty employee conduct that affected its business interests. The initial 1990 bill that the Governor vetoed contained no "material conflict of interest" provision at all, and, as a result,
"employers would not be allowed to prohibit employees from engaging in outside employment that is in conflict with their job responsibilities. Thus, for example, an employer could moonlight with a supplier, customer, or even a competitor, of a company. To go a step further, this bill would allow an employee of a company to [*5]endorse a competitor's product and leave the company with no recourse to terminate or otherwise discipline the employee" (Governor's Veto Mem, Veto Jacket, Veto 15 of 1990 at 8).
The revised 1991 bill vetoed by the Governor contained a relatively narrow "material conflict of interest" provision, which the Governor believed failed to adequately protect an employer's ability to control its employees' off-duty activities that might negatively affect its business. The unenacted 1991 carveout excluded an employee's legal activity from protection only if it "[m]aterially threaten[ed] an employer's legitimate conflict of interest policy reasonably designed to protect the employer's trade secrets, proprietary information or other proprietary interests . . . ." (1991 NY Senate Bill S4171-A, 1991 NY Assembly Bill A8738 [emphasis added]). The Governor vetoed the 1991 bill because it did not define "key terms, such as 'legal activities,' " and because it "would establish a wider protection without any recognition of the reasonable needs of employers to maintain some control over activities of their employees which, albeit legal, may have a negative effect on the mission of the employer" (Governor's Veto Mem, Veto Jacket, Veto 420 of 1991 at 13-14 [emphasis added]).
In response to the Governor's second veto, the Legislature amended the draft statute such that its current form excludes from protection employee activity that "creates a material conflict of interest related to the employer's trade secrets, proprietary information or other proprietary or business interest" (see Labor Law § 201-d [3] [a] [emphasis added]). Unlike the earlier versions, the enacted statutory text encompasses even those conflicts of interest not prohibited by an employer's written policy. Additionally, the exception recognizes that conflicts of interest arise from activity related to an employer's trade secrets, proprietary information, or other proprietary interests, as well as from activity related to an employer's "business interest[s]" more broadly. The inclusion of the phrase "business interest" confirms the legislative intent that courts should construe the provision to protect an employer's activities and business purpose. The statute thereby reflects the Legislature's intention to "strike the difficult balance between the right to privacy in relation to the non-working hours activities of individuals and the right of employers to regulate behavior which has an impact on the employee's performance or on the employer's business" (see Governor's Approval Mem, Bill Jacket, L 1992, ch 776 at 26).
The few courts that have interpreted the "material conflict of interest" provision have suggested that a "conflict of interest" may exist under the statute even without any material gain to the employee. For example, in Thomas v Smith, 2008 WL 11517444, *1, *3 [SD NY, Mar. 26, 2008, No. 06-CV-164 (KMK)], the plaintiff—whose public employer provided services to both victims and perpetrators of sexual assault—alleged she was fired because she made comments at a community forum advocating the castration of sex offenders. The U.S. District Court for the Southern District of New York upheld the plaintiff's claim under 42 USC § 1983 but rejected her Labor Law § 201-d claim on summary judgment because she "present[ed] no evidence rebutting [the employer]'s demonstration that her conduct at that forum materially conflicted with [the employer]'s business interests" (id. at *3 [emphasis omitted]). The court found that the plaintiff's statements materially conflicted with the employer's business interests because her "public support of castration as a means for punishing sex offenders offended [the employer]'s methods and philosophy, and exposed [the employer] to unfavorable attention in the local press" (id.). Therefore, the court concluded that the plaintiff's conduct fell within § 201-d (3) (a)'s "conflict of interest" exception even without any evident material gain to the employee.
Similarly, in Berg v German Nat. Tourist Off. (248 AD2d 297, 298 [1st Dept 1998], lv denied 92 NY2d 805 [1998]), the Appellate Division interpreted the "material conflict of interest" provision as allowing the German National Tourist Office to terminate an employee after learning that they were a translator of Holocaust revisionist articles. Although the court concluded without explanation that the exception applied,[FN2] given the nature of the translated articles and the Holocaust's historical connection to Nazi Germany, it is evident that plaintiff's off-duty activity could invite a public backlash against the employer, thereby constituting "a material conflict of interest" between the employee and the German National Tourist Office's "business interest."
In sum, the "material conflict of interest" exception applies even when an employee does not receive a financial benefit from their activity. What matters is whether and how the activity affects the employer's business interest, which includes how the business is perceived within the relevant community and whether the employee's activity places the business and its mission in a negative light.
IV.
As Supreme Court found, plaintiff's complaint alleges that the employer "is a Zionist Temple." Specifically, paragraphs 19 and 20 of the complaint allege the following:

"19. On July 15, 2021, SANDER was invited to a Zoom meeting with Rabbi LEVY and Block, purportedly to discuss the 11th and 12th grade programming for the 2021-22 school year. After a few minutes, Rabbi LEVY told SANDER that he had an 'awkward' question to ask her. He said that he had read a May 20, 2021 blog post on her website, and asked if she understood that WRT [or Westchester Reform Temple] was a Zionist institution and how comfortable she felt working at a Zionist institution as an anti-Zionist.
20. SANDER said she understood the political position of WRT and the larger Union of Reform Judaism in reference to Israel, respected it, and would not share her anti-Zionist views on the job."
Plaintiff's opening and reply briefs also characterize her complaint as referring to her employer's known "Zionist position":
"After reading the blog post and engaging Ms. Sander in a candid discussion of her views on Israel and Zionism — in which Ms. Sander said she respected the Zionist position of the Temple and would not share her anti-Zionist views at work — WRT's Rabbi and its Director of its school expressed full confidence in Ms. Sander as an educator, and in her ability to be a good role model for WRT's students" (emphasis added).
"An important distinguishing factual allegation here is that Sander told Rabbi Levy that she respected the Zionist position of WRT and would not share her private views at work."
"Rabbi Levy also heard Ms. Sander promise that she respected the Zionist position of WRT and would not share her anti-Zionist views at work."
"[The Temple] ha[s] also downplayed the Complaint's other allegations on this issue, including (1) Ms. Sander's promise to respect WRT's Zionism and not to share any anti-Zionist views on the job . . . ."
Furthermore, the complaint frames the content of Sander's blog post in a manner that is opposed to alternative viewpoints. That position is directly at odds with what plaintiff describes in her complaint as the Temple's spirit of openness and inquiry. For example, the complaint includes a section titled "WRT Says That It Is a Pluralistic, Inclusive Congregational Community Open to All 'World Views.' " Along these lines, the complaint asserts that "WRT's marketing materials paint it as a community that welcomes all Jews, as they are, regardless of political viewpoint." The complaint also quotes the Temple's website, which states: "WRT prides itself on being an inclusive community, where all our congregants feel welcome and accepted for who they are. We welcome and value the diversity of our members' . . . world views, and strive to create a culture of respect and acceptance, and a space where members are enriched by each other's participation in our community." As the majority recognizes, Sander's blog post left no room for discussion, outright "reject[ing] the notion that Zionism is a value of Judaism" (majority op at 3).
Plaintiff espoused a viewpoint (i.e. anti-Zionism) at odds with her employer's "philosophy" (i.e. Zionism) and its mission (Thomas, 2008 WL 11517444, *3). Thus, as the Temple asserts, plaintiff's publicly posted assertions and opinions directly undermine the Temple's business interest as a synagogue, as some congregants may view Zionism as a feature of their religious or ethnic identities as Jews.[FN3] Additionally, Sander's presence as a Jewish educator of children could invite a backlash among at least some of her students' parents due to her anti-Zionist views. If the Temple were to lose membership en masse, its proprietary or business interests—even as a nonprofit—would inevitably suffer. The fact that plaintiff gained no financial benefit from her blogging does not diminish or eliminate the conflict of interest that exists here. The employee in Thomas did not receive any monetary advantage by espousing their personal viewpoint publicly; rather, as in this case, the conflict of interest arose solely out of the potential reputational harm to the employer resulting from the employee's conduct.
For the reasons I have discussed, plaintiff's blog post falls within the statutory conflict of interest exception and thus, the complaint was properly dismissed for failure to state a cognizable legal theory for relief.
Order affirmed, with costs. Opinion by Judge Halligan. Chief Judge Wilson and Judges Garcia, Singas and Cannataro concur. Judge Rivera concurs in result in an opinion. Judge Troutman concurs in result for reasons stated in the memorandum decision of the Appellate Division (Sander v Westchester Reform Temple, 228 AD3d 688 [2024]).
Decided December 16, 2025

Footnotes

Footnote 1: A 2023 amendment added an exception for any "religious corporation, entity, association, educational institution or society that is exempt from the requirements of Title VII of the Civil Rights Act of 1964 . . . with respect to speech on religious matters to employees who perform work connected with the activities undertaken by such religious corporation, entity, association, educational institution or society" (Labor Law § 201-d [9]). That provision was enacted subsequent to this case and is not at issue here.

Footnote 1: See Recent Case, First Amendment—Religion—Fourth Circuit Schism Spotlights Unholy Consequences of Ministerial Exception Doctrine, 137 Harv L Rev 1765, 1765 (2024) (stating that the ministerial exception's "nebulous assessment criteria beget confusion and inconsistent application").

Footnote 2: The court assumed, without deciding, that the activity was a recreational activity under Labor Law § 201-d (1) (b).

Footnote 3: The Temple continues to publicly support Israel (see Westchester Reform Temple, WRT Stands with Israel, available at https://www.wrtemple.org/about/wrt-stands-with-israel/ [last accessed Dec. 7, 2025]; Westchester Reform Temple, Mission, available at https://www.wrtemple.org/about/mission-statement/ [last accessed Dec. 7, 2025] [describing one aspect of its mission as "supporting the Jewish people and the State of Israel"]).